# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KRISTA LYNN KINSLEY, | ) | CASE NO. 5:17CV00604 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Krista Lynn Kinsley, ("Plaintiff" or "Kinsley"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In July 2014, Kinsley filed an application for POD and DIB, alleging a disability onset date of April 9, 2013 and claiming she was disabled due to neuropathy, cubital tunnel syndrome, medial epicondylitis, and carpal tunnel, in the right upper extremity.  She also alleged lateral epicondylitis, depression, and cervical radiculopathy.  (Transcript ("Tr.") 167, 189, 208.)  The applications were denied initially and upon reconsideration, and Kinsley requested a hearing before an administrative law judge ("ALJ").  (Tr. 104, 111, 122.)

On June 16, 2016, an ALJ held a hearing, during which Kinsley, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 38-70.)  On June 27, 2016, the ALJ issued a written decision finding Kinsley was not disabled.  (Tr.15-37.)  The ALJ' s decision became final on January 27, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On March 22, 2017, Kinsley filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 12, &13.)  Kinsley asserts the following assignments of error:

(1)   New and material evidence submitted to the Appeals Council supports a Sentence 6 remand.

(2)   The ALJ erred by finding Plaintiff's left arm impairment was not severe because it did not last twelve months.

(3)   The ALJ's credibility determination is not supported by substantial evidence.

(4)   The ALJ failed to properly weigh the opinion evidence, rejecting treating source opinions based on his flawed credibility finding.

(Doc. No. 10.)

2

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

Kinsley was born in June 1969 and was 46 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 30.)  *See* 20 C.F.R. §§ 404.1563(c).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a paralegal.  (*Id.*)

**B.    Medical Evidence**[2]

**1.    Mental Impairments**

On May 22, 2014, Kinsley began treatment with psychologist Margot Kessler, Ph.D. for mental health counseling.  (Tr. 487.)  During this visit, Kinsley indicated she had been terminated from work due to her medical problems.  She described sadness, anxiety, and financial concerns, and was tearful during the evaluation.  (*Id.*)  Dr. Kessler noted Kinsley had an anxious and depressed affect, but normal memory and concentration.  (Tr. 490.)  She observed Kinsley was both intelligent and motivated.  (*Id.*)

Thereafter, Kinsley visited Dr. Kessler an average of twice a month.  Kinsley's treatment notes indicated her primary focus was on her right arm limitations.  (Tr. 485, 483.)  She was sad, angry, and anxious.  (Tr.  483.)  However, on July 17, 2014, Dr. Kessler noted Kinsley had "made significant progress with acceptance."  (Tr. 477.)

On August 6, 2014, Dr. Kessler filled out a form created by the Social Security Administration.  (Tr. 473.)  On the form, Dr. Kessler reported the following:

---

[2]    The Court's discussion is not intended to be exhaustive and covers only that medical evidence identified by the parties in their Briefs.

3

- Kinsley is "depressed and anxious about her disability.  She is fully oriented, has lost motivation due to chronic pain, and feels sad about being terminated from work due to her medical condition.  [She] struggles with short term memory loss and distractability."

- She "has above average intellectual ability.  Her concentration, persistence/pace, short term memory have been affected by her pain medication.  Her frustration tolerance is low."

- Her "dominant arm is weak, swollen at times and unable to successfully complete tasks of daily living.  [She] has improved her use of [her] non dominant arm in order to function."

- She "performs adequate self-care.  The disability has changed [her] habits and interests in a significant way.  [She] loved her job and it was a primary identity for her.  Her energy level has significantly declined."

- She "does not have the energy which was in her trademark prior to contracting neuropathy in [her] right arm.  She frequently rests her arm to minimize pain.  She attempts to function within her family."

- "The pain level in her right arm varies throughout the day and from day to day.  [Her] function and mental state is directly related to the pain experience."

- Her "neurologic problems with her arm began" in the Fall of 2012.  "She was terminated from work due to medical absenteeism.  Financial concerns and chronic pain have persisted which have impacted her depression and anxiety."

- She "is making appropriate physical and emotional accommodations.  She has used coping strategies to deal with depression and anxiety with moderate success.  [She] has a strong social support system.  It is difficult for a vibrant, energetic 45 year-old woman to accept a very disabling condition (loss of the use of her right arm)."

- She "has difficulty with daily stressors and would not be able to tolerate work-place stressors at this time due to both physical and psychological limitations.  Ex[ample]: [She] has difficulty reading due to concentration and memory deficits (partly due to her pain medications)."

4

(Tr. 474-475.)

On October 8, 2014, Kinsley visited a nurse practitioner[3] at a primary care practice.  (Tr. 596.)  She reported feeling "down," and indicated she was "short" with family members.  (*Id*.)  She denied any thoughts of hurting herself or others.  (*Id*.)  The nurse practitioner diagnosed her with depression and prescribed Cymbalta.  (*Id*.)

On October 29, 2014, Dr. Kessler filled out another Social Security Administration form. In the "Mental Status Questionnaire" section of the form, Dr. Kessler noted the following:

- Kinsley has good hygiene and a normal gait;

- Her flow of conversation is normal;

- Her mood is "pessimistic, sad, narrow range of emotions, congruent affect, labile, easily annoyed, [and she] puts on a socially appropriate face;"

- She has worry and racing thoughts;

- She is easily distracted but fully oriented;

- She has a decrease in "short term memory, poor abstract reasoning, [and an] average fund of knowledge;"

- She has "no current use of alcohol," is "currently taking prescribed pain medication," is verbally aggressive by self-report, and "dependent on spouse due to recent disability."

- She had three surgeries on her right hand;

- Her diagnoses are Major Depressive Disorder and Anxiety, Not Otherwise Specified;

- She takes Cymbalta, Celebrex, a Lidoderm patch, Percocet, and Neurontin.  Her medication side effects include drowsiness, feeling "fuzzy," decreased short term memory, nausea, and headaches.  She

---

[3]    The signature of Plaintiff's nurse practitioner is illegible.

5

cannot drive due to these side effects.

(Tr. 606-607.) In the section of the form entitled "Medical Source Statement," Dr. Kessler found the following:

- Kinsley "needs to write down things to remember" and her "verbal understanding has declined."

- She has "difficulty maintaining attention over 15 minutes."

- She has "difficulty completing tasks that require more than 15 minutes. Physical [impairments] also interfere with completion of tasks."

- She reports anxiety at social events. She "reports anger when events require adaptation."

- "Mentally, [she] would be able to deal with simple tasks. Physically, [she] struggles with the use of her right arm so repetitive tasks (even simple ones) create pain and exhaustion."

(Tr. 607.) Under the section of the form entitled "Daily Activities Questionnaire," Dr. Kessler noted the following:

- Kinsley lives with her husband, two daughters, and two cats in a three bedroom bungalow.

- She is "unable to lift above one pound with her right hand. She could live alone with assistance."

- She is "on good terms with people – for short periods of time."

- She visits with family and friends on a weekly basis. These visits are 90 minutes long, and during these visits, she will watch television, play cards, and sit outside.

- She got along "very well" with former employers, supervisors, and co-workers.

- Her "high need for rest," "inability to use her right hand," and her varying ability to drive due to her medications, would possibly "prevent work activities for a usual work day or work week."

6

- She is able to prepare food and complete household chores with help from her husband and daughters.

- She is able to shop with a list, but requires "help carrying and pushing cart."

- She drives short distances, depending upon her medication schedule.  She can "only drive using one hand."

- She watches her children's sporting events.

- She is compliant with her medications and cognitive behavioral therapy treatment.

(Tr. 608-609.)

On January 13, 2015, Kinsley visited Dr. Kessler, indicating she had lost confidence and had been retreating from social events.  (Tr. 633.)  Dr. Kessler suggested Kinsley try meditation.  (*Id*.)  On February 3, 2015, Dr. Kessler noted Kinsley had an "increased acceptance of present state of health."  (Tr. 632.)  Kinsley reported she still enjoyed attending her daughter's sporting events.  (*Id*.)  On March 17, 2015, she relayed she had an upcoming family vacation, but still had "days where she cannot accomplish normal tasks."  (Tr. 630.)  On April 9, 2015, Kinsley reported she enjoyed her family vacation.  (Tr. 629.)  However, Dr. Kessler noted Kinsley remained focused on her limitations.  (*Id*.)

Kinsley continued to see Dr. Kessler a few times a month.  She often discussed her struggle with acceptance of arm limitations and guilt over her unemployment.  (Tr. 624, 635, 653.)  She indicated self-doubt, but also ongoing progress.  (Tr. 625.)  On September 17, 2015, Kinsley described having a "mental fog."  (Tr. 635.)  On December 2, 2015, she visited Beth Musgrove, a nurse practitioner, who discontinued her Cymbalta and prescribed Wellbutrin.  (Tr. 710.)

7

On January 14, 2016, Kinsley indicated she wanted to shift her focus away from her disability. (Tr. 649.) She was looking forward to an upcoming home remodeling project. (*Id*.) On February 25, 2016, Dr. Kessler noted Kinsley had been "disabled for three years," and had "lost [her] career path." (Tr. 647.) Kinsley reported she wanted to start volunteering and enroll in adult education courses. (*Id*.) Dr. Kessler noted Kinsley was displaying increased forgiveness and "self compassion." (*Id*.)

On April 7, 2016, Kinsley reported she found travel "challenging." (Tr. 706.) She relayed she was struggling with organization and memory due to her medications. (*Id*.) On April 28, 2016, Kinsley again reported medication side effects, including distractibility and confusion. (Tr. 704.) She indicated preference for social isolation, which was "out of character" for her. (Tr. 704.) Dr. Kessler noted good eye contact and a logical thought process. (Tr. 704, 705.) Dr. Kessler further noted Kinsley struggled with "the reality of her present situation" and executive functioning. (Tr. 705.)

### 2. Physical Impairments

On February 8, 2013, Kinsley visited nurse practitioner Beth Cooke, CNP, indicating intermittent right arm pain, right arm weakness, decreased grasp, and shooting pain in her right wrist for the past two months. (Tr. 445.) She also described numbness and tingling in the middle two fingers of her right hand. (*Id*.) On examination, Kinsley had a mildly reduced range of motion in the right elbow, and a pain-free range of motion in her right wrist. (Tr. 446.) Her left upper extremity had normal strength, but her right hand grasp was weak. (*Id*.) Ms. Cooke prescribed Kinsley a course of steroids and ordered a nerve conduction study. (*Id*.)

A February 20, 2013 nerve conduction study revealed right median mononeuropathy at

8

the wrist.  (Tr. 356.)  This finding was consistent with a mild degree of carpal tunnel syndrome.  (*Id.*)  The study was negative for any radicular changes.  (*Id.*)

Kinsley returned to Ms. Cooke on February 21, 2013.  She reported the steroids had improved her symptoms.  (Tr. 448.)  However, she indicated typing at work worsened her wrist symptoms.  (*Id*.)  Ms. Cooke reviewed the nerve conduction study, prescribed Naproxen and a wrist brace, and referred Kinsley to an orthopedist.  (Tr. 449.)

On March 4, 2013, Kinsley consulted with orthopedist Ajay Seth, M.D.  (Tr. 377.)  Dr. Seth diagnosed Kinsley with medial and lateral epicondylitis of the right elbow, and cubital tunnel and carpal tunnel syndrome on the right side.  (Tr. 379.)  Dr. Seth injected Kinsley's right elbow with cortisone, and recommended a surgical procedure.  (*Id*.)  Kinsley returned to Dr. Seth on March 19, 2013, reporting relief in her medial right elbow for several days after the injection.  (Tr. 381.)  She indicated she was having difficulty typing at work due to her pain.  (*Id.*)  On April 10, 2013, Kinsley underwent the surgical release of her right carpal tunnel and right "medial microtenotomy Topaz procedure" in the epicondyle (i.e., elbow).  (Tr. 287.)

Following these procedures, Kinsley underwent occupational therapy for her right upper extremity.  (Tr. 560.)  Her initial visit was on April 22, 2013, with occupational therapist Annette Webb.  (*Id*.)  Ms. Webb noted the sensation in Kinsley's fingers had improved, but she still had slight numbness.  (Tr. 561.)  On examination, Kinsley had difficulty fully flexing her right fingers.  (Tr. 562.)

Kinsley then attended occupational therapy a few times a week in April and May 2013.  On April 26, 2013, Kinsley's elbow movement had improved, but full extension was still painful.  (Tr. 522.)  On May 8, 2013, she indicated she had rested her elbow for five days, but it was still

9

very tender.  (Tr. 525.)  Ms. Webb noted "very small movements in the right thumb bother her more than fully bending or straightening the thumb."  (*Id.*)  On May 10, 2013, Kinsley relayed she felt better on the days she had therapy, but continued to have high levels of pain in her right wrist and elbow.  (Tr. 525.)  On examination, the area of hypersensitivity and pain in her elbow was decreasing.  (*Id.*)  On May 20, 2013, Ms. Webb noted Kinsley's elbow extension had worsened by 15 degrees since her initial occupational therapy visit.  (Tr. 565.)  Kinsley had difficulty tolerating the "end range of shoulder motions" due to medial elbow pain.  (*Id.*)

On May 21, 2013, Dr. Seth concluded Kinsley's ulnar nerve was irritated, and prescribed Lyrica and steroids.  (Tr. 393.)  Kinsley returned to Dr. Seth on June 11, 2013, reporting the Lyrica made her "loopy."  (Tr. 396.)  However, she indicated overall improvement.  (*Id.*)  Dr. Seth noted her therapy numbers confirmed improvement as well.  (*Id.*)  He recommended she continue therapy and prescribed Mobic.  (*Id.*)

Kinsley continued to attend occupational therapy a few times a week in June 2013. During this time, she attempted to practice work-related activities, such as typing.  (Tr. 572, 533, 532.)  After 10-15 minutes of typing, she would have increased burning pain in her right elbow and cramping in her fingers.  (Tr.  532, 533, 534.)  On June 24, 2013, Kinsley indicated she had taken a low dosage of Lyrica for three days, and had decreased elbow soreness and finger cramping.  (Tr. 536.)

On June 26, 2013, Kinsley had an updated occupational therapy assessment.  (Tr. 574.) Her right upper extremity range of motion was nearly within normal limits.  (*Id.*)  Her right hand grip strength was improved, but remained moderately decreased compared to the left hand.  (*Id.*) She had diminished light touch sensation in the right palm, and diminished protective sensation

10

in the small right finger.  (*Id.*)

On July 16, 2013, her occupational therapist noted Kinsley had "limited use of [right upper extremity] only tolerating light use for short periods of time."  (Tr. 541.)  On July 19, 2013, Kinsley reported her cubital tunnel symptoms had worsened since decreasing her therapy sessions to 1-2 times a week.  (Tr. 542.)  She expressed concern over being able to tolerate her job.  (*Id.*)

On July 23, 2013, Dr. Seth noted Kinsley had a full range of motion in her right elbow, with discomfort.  (Tr. 397.)  Dr. Seth felt her symptoms were caused by the subluxation of the right ulnar nerve.  (Tr. 399.)  He told her to discontinue therapy, and recommended an ulnar nerve transposition to the right elbow.  (*Id.*)  Kinsley underwent this surgical procedure on August 14, 2013.  (Tr. 285.)

On August 26, 2013, Kinsley indicated she was "doing well," and no longer required Vicodin.  (Tr. 404.)  On examination, she had a mildly limited range of motion and mild soft tissue swelling.  (*Id.*)  Dr. Seth removed her sutures and told her to re-start occupational therapy.  (*Id.*)

On September 4, 2013, Kinsley re-established with occupational therapist Annette Webb, OT.  She had aching in her right palm, right elbow pain, along with extreme hypersensitivity to textures or pressure along her surgical scar.  (Tr. 577.)  On examination, she had normal range of motion in her right fingers.  (Tr. 578.)  She did have some difficulty with "isolated abduction of the right small finger."  (*Id.*)  On September 11, 2013, Ms. Webb noted Kinsley's tolerance for right upper extremity use remained "severely limited."  (Tr. 545.)  She noted Kinsley was experiencing "moderate to high levels of pain."  (*Id.*)  On September 16, 2013, Kinsley indicated

11

she had been "doing well" with her right elbow, until she went shopping and out to lunch.  (Tr. 545.)  She reported severe, burning pain in her right elbow the evening after she went shopping. (*Id*.)

On September 17, 2013, Kinsley reported to Dr. Seth she was still having pain in her right elbow, but her Ultram was helpful.  (Tr. 407.)  She described some swelling in the evening.  (*Id*.) Dr. Seth prescribed Lyrica, Mobic, and steroids.  (*Id*.)  On September 30, 2013, Kinsley began to use a TENS unit for her right elbow.  (Tr. 547.)  On October 7, 2013, she indicated "significant pain relief" with the TENS unit.  (Tr. 549.)  At that time, therapist Webb noted Kinsley made gradual gains in right upper extremity range of motion, but she still had limitations in her elbow, forearm, and wrist.  (*Id*.)  Kinsley indicated her Lyrica was making it difficult to concentrate. (*Id*.)

On October 10, 2013, Kinsley reported to Dr. Seth she was "doing better" overall.  (Tr. 409.)  Dr. Seth advised Kinsley her recovery would possible take up to 18 months.  (*Id*.)

Kinsley was discharged from occupational therapy on October 28, 2013.  Therapist Webb noted Kinsley had attempted to modify her daily tasks, but she was still not able to perform her usual cooking activities.  (Tr. 580.)  Kinsley no longer had any numbness or tingling in her fingers, and her tolerance for activity had gradually improved.  (Tr. 581, 582.)  She did continue to have burning pain in her right elbow with activity, and she could not perform tasks requiring sustained gripping and pinching.  (Tr. 582.)  Kinsley reported she was planning on returning to work twice a week, and working from home three days a week.  (Tr. 581.)

On January 7, 2014, Kinsley visited primary care physician Betsy Kendis, M.D.  (Tr. 451.)  She indicated she returned to work, but it exacerbated her pain.  (*Id*.)  She also described

poor focus, due to her medications.  (*Id.*)  On examination, she had pain with elbow extension, but not with flexion or movement of the wrist.  (Tr. 453.)  She was tender to palpation in the lateral elbow and forearm.  (Tr. 453.)  Dr. Kendis recommended Kinsley seek a second opinion regarding her right elbow, and possibly start an antidepressant.  (*Id.*)  Kinsley declined any psychological treatment.  (*Id.*)

Kinsley returned to Dr. Seth on January 14, 2014.  She reported burning pain in her right elbow and indicated her Lyrica was making her "crazy."  (Tr. 415.)  On examination, her right elbow had mild to moderate tenderness, along with some swelling.  (Tr. 416.)  Her elbow extension and flexion were normal, as was her muscle strength and light touch sensation.  (*Id.*)  She had pain with resisted wrist extension.  (*Id.*)  Dr. Seth indicated he "believe[d] her nerve is starting to get better."  (*Id.*)

On January 16, 2014, Kinsley began a new round of occupational therapy, with occupational therapist Lisa Jenkins, OT.  (Tr. 367.)  Kinsley reported her range of motion had improved since her operation, and she no longer had a sensation of being "shocked."  (*Id.*)  She indicated continued difficulty with hair styling, food preparation, and job tasks.  (Tr. 368, 369.)  On examination, she had hypersensitivity in the medial aspect of her right elbow and decreased grip strength on the right side.  (*Id.*)  On February 13, 2014, Kinsley reported increased pain to therapist Jenkins.  (Tr. 360.)  She relayed she could not move her right upper extremity that morning, and she was always in a "mental fog" due to her medications.  (*Id.*)

On February 17, 2014, Kinsley had a consultation with orthopedist R. William McCue, M.D., at the Crystal Clinic.  (Tr. 585.)  On examination, she did not appear to be in any acute distress.  (Tr. 460.)  Her light touch sensation was slightly diminished in the right small finger.

13

(*Id*.)  Her thenar and ulnar intrinsic strength was normal in both hands, and she had no muscle atrophy in the small muscles of either hand.  (*Id*.)  Her Phalen and elbow flexion tests were negative in both upper extremities.  (*Id*.)  There were no areas of swelling in either hand or wrist.  (*Id*.)  She was markedly tender at the elbow.  (*Id*.)  She had full motion in both of her hands and wrists, and a full range of motion, with pain, in her right forearm and elbow.  (*Id*.)  Dr. McCue noted Kinsley held her elbow in a slightly flexed position.  (Tr. 461.)  He recommended a resting splint for her wrist and forearm, and an elbow splint at night.  (*Id*.)  He referred her for myofascial pain treatments.  (*Id*.)  Kinsley underwent a myofascial release treatment on February 28, 2014.  (Tr. 327.)

On March 4, 2014, Kinsley consulted with orthopedist Richard S. Brower, M.D., at the Crystal Clinic.  (Tr. 292.)  Dr. Brower noted Kinsley "really does not have arm pain except for locally around the area of her surgery on the inside of the right elbow."  (*Id*.)  Kinsley reported because of her elbow pain and the side effects of the Lyrica, she could not work.  (*Id*.)  On examination, Kinsley had no strength deficits, but she was very tender on the inside of her left elbow.  (*Id*.)  Dr. Brower was concerned her neck was the cause of her symptoms, so he ordered cervical spine x-rays.  (*Id*.)  However, the x-rays indicated a well-maintained cervical spine, a small amount of facet arthrosis, and mild degenerative disc disease.  (*Id*.)

Based upon this examination and x-rays, Dr. Brower concluded her "symptoms are related to ulnar nerve irritation on the inside of the right elbow."  (Tr. 293.)  He did not see any evidence of her symptoms being related to her cervical spine.  (*Id*.)  He referred her to Dr. Hayek, a specialist, in the hopes of "sort[ing] her out medication-wise to see if there is a way to get her feeling more comfortable and able to work without being on so much Lyrica."  (*Id*.)

14

Kinsley then visited physical medicine and rehabilitation physician Anthony Hayek, D.O., on March 31, 2014.  (Tr. 591.)  On examination, she had "exquisite tenderness" in her right elbow.  (Tr. 592.)  Dr. Hayek ordered a nerve conduction study and electromyography of her right upper extremity.  (*Id*.)  The testing was suggestive of right ulnar neuropathy with conduction block, chronic in nature.  (*Id.*)  There was no evidence of any acute findings, peripheral neuropathy, or cervical radiculopathy.  (*Id*.)  Based upon this testing, Dr. Hayek concluded Kinsley's ulnar neuropathy, while likely chronic, was also healing, as her distal ulnar sensory and ulnar motor studies were all normal.  (*Id*.)  He recommended she return after an elbow MRI, in order to adjust her medication dosages.  (*Id*.)

On April 2, 2014, Kinsley returned to Dr. McCue for further evaluation.  (Tr. 312.)  On examination, she had significant discomfort to palpation of the skin and deeper tissues in the medial right elbow and cubital tunnel areas.  (*Id*.)  She had no atrophy in her hand, and her two-point discrimination was normal in all of her right fingers.  (*Id*.)  Her Phalen and median nerve compression tests were negative in the right wrist.  (*Id*.)  Based upon this examination, Dr. McCue was unable to determine the etiology of her burning right elbow pain.  (*Id*.)  He was reluctant to recommend further surgery, as her right ulnar nerve function was normal by physical examination.  (*Id*.)  Kinsley underwent a myofascial release treatment on this same date.  (Tr. 322.)

On April 15, 2014, a right elbow MRI revealed very mild thickening and edema of the ulnar nerve, which suggested neuritis.  (Tr. 387.)  There were no visible areas of compression. (*Id*.)  There was "minimal common flexor tendinonsis with scarring at the musculotendinosis junction of the flexor digitorum superficialis", and her ulnar collateral ligament was mildly

15

thinned and lax.  (*Id.*)  Kinsley followed up with Dr. Seth on May 1, 2014, reporting her Lyrica and Ultram were "somewhat helpful."  (Tr. 425.)  Dr. Seth noted the MRI revealed no compression.  (*Id.*)  He ordered a cervical MRI to rule out any radiculopathy.  (Tr. 433.)  Dr. Seth concluded if the cervical MRI was negative, Kinsley would need a "repeat release of the ulnar nerve with axo guard application."  (*Id.*)

Prior to obtaining a cervical MRI through her insurance, Kinsley had to undergo a course of physical therapy.  (Tr. 350.)  Kinsley attended five physical therapy visits from June 18 – July 3, 2014 for her cervical spine.  (Tr. 338, 341, 343, 345, 350.)  During her initial evaluation, she had a slightly limited range of motion in her cervical spine.  (Tr. 350.)  Her right shoulder abduction was limited by 80 degrees.  (*Id.*)  By her July 3, 2014 discharge, her neck pain and range of motion had improved.  (Tr. 338.)  Her cervical spine range of motion was normal.  (Tr. 339.)  She continued to have right upper extremity pain. (*Id.*)

On August 27, 2014, Kinsley underwent an "ulnar nerve neurolysis procedure" on her right elbow, along with "application of an axle guard around [the] ulnar nerve in [her] right arm," and neurolysis of the "right anteromedial antebrachial cutaneous nerve."  (Tr. 500.)  Following the procedure, Dr. Seth informed Kinsley her ulnar nerve had been severely compressed, and indicated signs of being without blood flow for a "considerable amount of time."  (Tr. 499.)

Kinsley saw Dr. Seth several times in September 2014.  (Tr. 494, 496, 605.)  By September 11, 2014, her burning pain had improved.  (Tr. 494.)  On September 25, 2014, she had burning and pain in her right elbow, along with cramping in her right palm.  (Tr. 605.)  Her elbow range of motion was "good," and Dr. Seth encouraged her to continue to use her right arm. (*Id.*)

16

Kinsley attended physical therapy throughout September 2014 with occupational therapist Michelle Walsh-Stewart, OT.  (Tr. 602.)  On September 30, 2014, after thirteen therapy sessions, Kinsley had improvements in her right elbow, forearm, and wrist motions.  (*Id*.)  However, her right elbow and wrist extension still remained limited.  (*Id*.)  She had decreased right grip and pinch strength.  (*Id*.)  She reported she was having "difficulty with gripping objects, picking up small objects, and squeezing toothpaste," but was able to wash her hair, put dishes away, and use her arm to open the refrigerator or microwave.  (*Id*.)

On October 17, 2014, after twenty therapy sessions, Ms. Walsh-Stewart noted Kinsley had a "fair tolerance for light strengthening tasks," and was "making gains with grip strength." (Tr. 600.)  Kinsley was attempting to use her right upper extremity more often, but still had problems squeezing bottles and writing.  (*Id*.)

Kinsley followed up with Dr. Seth on October 21, 2014, reporting her right elbow pain and burning was "about the same."  (Tr. 598.)  Dr. Seth noted Kinsley's elbow range of motion was full, and her strength had improved, but her "feeling and sensations are about the same." (*Id*.)  He concluded "we are going to keep her off work as we don't believe she is able to return to this type of work at this time.  Due to her decreased strength, ongoing pain and continued numbness in the small and ring fingers, we don't feel she is ready to return to work."  (*Id*.)

On December 30, 2014, Dr. Seth noted Kinsley had an "excellent" range of motion, but a moderate amount of swelling in her right elbow.  (Tr. 621.)  Kinsley still had pain with repetitive exercises and required narcotics for pain control.  (*Id*.)  Dr. Seth then referred Kinsley to a pain management physician.  (Tr. 623.)

On January 27, 2015, Kinsley returned to Dr. Hayek's office.  (Tr. 619.)  She reported she

17

discontinued the Lyrica, due to the cognitive side effects.  (*Id*.)  She indicated her main concern was burning paresthesia in her right fourth and fifth fingers, along with some ulnar intrinsic weakness in her right hand.  (*Id*.)  On examination, Kinsley's right upper extremity strength was 5/5, "with the exception of weakness at her right abductor digiti minimi."  (Tr. 620.)  She had decreased sensation over her 4th and 5th digits and right medial forearm.  (*Id*.)  Dr. Hayek concluded Kinsley's "main limiting factor is currently her neuropathic pain."  (*Id*.)  He increased her Neurontin dosage and prescribed Percocet for occasional use.  (*Id*.)

Kinsley returned to Dr. Hayek on February 24, 2015, reporting sedation due to the medication increase.  (Tr. 617.)  Dr. Hayek told her to return in four months for further evaluation.  (Tr. 618.)  In his treatment notes, he made the following notation: "I will fill out disability paperwork as she remains on long-term disability and is unable to work at this time due to current loss of function at her right hand."  (*Id*.)

On June 16, 2015, Kinsley returned to Dr. Seth's office, indicating increased pain in her left lateral elbow over the past six weeks.  (Tr. 638.)  On examination, she had moderate tenderness in her elbow, with pain at the end of extension of the elbow.  (Tr. 639.)  Her left upper extremity strength was decreased, measuring at 4 on a scale of 5.  (*Id*.)  Her light touch sensation was normal.  (*Id*.)  Dr. Seth administered a depomedrol injection to the left elbow.  (*Id*.)

Kinsley visited Dr. Hayek on June 22, 2015, reporting her symptoms were "slightly better."  (Tr. 615.)  Dr. Hayek noted decreased grip strength on the right side.  (Tr. 616.)  He added Elavil to her medication regimen.  (Tr. 615.)

Kinsley then underwent acupuncture several times with Y.P. Mok, M.D., a pain management specialist, beginning on August 3, 2015.  (Tr. 717, 718, 719.)  She subsequently

returned to Dr. Hayek's office on October 28, 2015, with a decrease in her finger paresthesia. (Tr. 644.)  She had improved sleep with the Elavil, but reported a "drug hangover" in the morning.  (*Id*.)  She indicated overall, her symptoms were about the same.  (*Id*.)  Dr. Hayek noted Kinsley was "barely taking Percocet anymore."  (*Id*.)  On examination, Kinsley had tenderness over her right ulnar groove, but well maintained strength at her right shoulder and elbow.  (Tr. 645.)  She had weakness in her right hand, along with hypersensitivity in her right 4th and 5th fingers and medial elbow.  (*Id*.)

On November 24, 2015, Kinsley saw Dr. Seth for her recent left elbow symptoms.  (Tr. 694.)  She reported the pain was "intermittent" and "worse with use."  (*Id*.)  She had been wearing a left elbow brace without much relief.  (*Id*.)  On examination, she had tenderness and 4/5 strength in her left elbow and wrist.  (Tr. 695.)  She had a full range of motion without pain in her wrist and hand, and her light touch sensation was normal.  (*Id*.)  Dr. Seth prescribed Kinsley Tramadol and referred her for physical therapy.  (Tr. 695, 696.)

Kinsley returned to Dr. Seth on January 5, 2016, reporting improvement in her left elbow pain with physical therapy.  (Tr. 675.)  She had increased range of motion in her left elbow and was able to perform more activities with the left arm.  (*Id*.)  Dr. Seth encouraged her to continue therapy, as she was showing improvement.  (Tr. 677.)  Kinsley underwent an acupuncture session with Dr. Mok on January 26, 2016.  (Tr. 715.)  She indicated continued cramping and burning in her right hand, and recent left arm symptoms.  (*Id*.)

On February 22, 2016, Kinsley returned to Dr. Hayek.  Dr. Hayek noted underlying tenderness at her right ulnar groove, and well maintained strength at her right shoulder and elbow.  (Tr. 643.)  Kinsley had weakness in her right hand intrinsic muscles, hypersensitivity in

19

her 4th and 5th right digits, and decreased sensation at her medial forearm and elbow.  (Tr. 643.)

Kinsley had another session of acupuncture with Dr. Mok on February 23, 2016.  (Tr. 721.)

During this session, Dr. Mok noted her left hand had improved "rapidly after the last visit and

now has no further symptoms in this hand."  (*Id.*)  Kinsley indicated some "good days" with her

right hand.  (*Id.*)

On March 8, 2016, Kinsley indicated her left arm was doing "much better" with therapy.

(Tr. 655.)  Dr. Seth encouraged her to continue home therapy and stretching.  (*Id.*)

The Court notes also Kinsley submitted a "symptom log" to the ALJ.  This log, created

through a program on her smart phone, documents her reported pain and daily activities from

April 1, 2014 through June 11, 2016.  (Tr. 722-839.)  As this log spans over 100 pages, and

contains Kinsley's *subjective reports*, rather than *objective medical evidence*, the Court will

discuss the pertinent portions of this log in more detail when relevant to the discussion and

analysis below.

**C.      State Agency Reports**

**1.      Mental Impairments**

On September 1, 2014, state agency physician Melanie Bergsten, Ph.D., reviewed

Kinsley's medical records and completed a Psychiatric Review Technique ("PRT") and Mental

Residual Functional Capacity ("RFC") Assessment.  (Tr.77-78, 81-83.)  She concluded Kinsley

had (1) moderate restrictions in activities of daily living; (2) mild difficulties in maintaining

social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace;

and (4) no episodes of decompensation.  (Tr. 77.)  With regard to Kinsley's mental functional

limitations, Dr. Bergsten found Kinsley was moderately limited in her abilities to (1) maintain

attention and concentration for extended periods; (2) complete a normal workday and workweek

without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods; and (3) respond appropriately to

changes in the work setting.  (Tr. 81-83.)  She found Kinsley was not significantly limited in her

abilities to (1) remember locations and work-like procedures; (2) understand, remember, and

carry out very short and simple instructions; (3) understand, remember, and carry out detailed

instructions; (4) perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; (5) sustain an ordinary routine without special supervision;

(6) interact appropriately with the general public; (7) accept instructions and respond

appropriately to criticism from supervisors; (8) get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; and (9) set realistic goals or make plans

independently of others.  (*Id*.)  Dr. Bergsten found no evidence of any limitation in her abilities

to (1) work in coordination with or in proximity to others without being distracted by them; (2)

make simple work-related decisions; (3) ask simple questions or request assistance; (4) maintain

socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (5) be

aware of normal hazards and take appropriate precautions; and (6) travel in unfamiliar places or

use public transportation.  (*Id*.)  Dr. Bergsten explained the basis of her decision as follows:

> Concentration, persistence and pace are noted to be reduced secondary to
> pain medication.  However, she is able to prepare meals and perform
> household chores within her physical limitations.  She is also able to drive,
> shop, and manage finances.  **Claimatn[sic] is able to perform simple and
> complex tasks that are not fast paced.**
>
> ***
>
> Treating source opines that claimant demonstrates low frustration tolerance
> but evidence in file does not support this decision.  There is no evidence of

21

> repeated psychiatric hospitalizations or episodes of decompensation.
> Furthermore, treating source notes indicate that claimant is making
> appropriate emotional accommodation, she has accepted her loss as well as
> she can and made significant progress, and she has a strong support group.

(Tr. 82-83.) (emphasis added).

On December 10, 2014, state agency physician Kristen Haskins, Psy.D., reviewed

Kinsley's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 93-94, 98-

100.)  She concluded Kinsley had (1) mild restrictions in activities of daily living; (2) mild

difficulties in maintaining social functioning; (3) moderate difficulties in maintaining

concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 93.)  With

regards to Kinsley's mental functional limitations, Dr. Haskins affirmed Dr. Bergsten's

assessments.  (Tr. 98-100.)

### 2.        Physical Impairments

On September 9, 2014, state agency physician Steve E. McKee, M.D., reviewed

Kinsley's medical records and completed a Physical Residual Functional Capacity ("RFC")

Assessment.  (Tr. 79-81.)  Dr. McKee determined Kinsley could lift and carry 20 pounds

occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour

workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 79.)  He further found Kinsley

was limited to occasional pushing and pulling with the right upper extremity, and noted her "left

arm is normal."  (*Id.*)  He found she could never climb ladders, ropes, or scaffolds, and had an

unlimited capacity to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.  (Tr. 79-80.)

Dr. McKee found she was "limited to occasional use of [the right upper extremity] for functional

tasks, including reaching in all directions. [The left upper extremity] is normal and not impaired."

(Tr. 80.)  He found no visual or communicative limitations.  (*Id.*)  He found Kinsley would need

22

to avoid concentrated exposure to hazards, such as unprotected heights, heavy machinery, and commercial driving.  (Tr. 81.)

On December 3, 2014, state agency physician Anne Prosperi, D.O., reviewed Kinsley's medical records and completed a Physical RFC Assessment.  (Tr. 95-97.)  She found Kinsley could occasionally crawl.  (Tr. 96.)  She adopted the remainder of Dr. McKee's opinion.  (Tr. 95-97.)

**D.  Hearing Testimony**

During the June 16, 2016 hearing, Kinsley testified to the following:

- She graduated high school.  (Tr. 44.)  She has an Associate's Degree in Legal Assisting.  (Tr. 53.)

- She is right-handed.  (Tr. 44.)  She has had multiple surgeries on her right arm. (Tr. 48.)  She stopped working after her first surgery, because she needed to undergo rehabilitation.  (*Id*.)  She continued to have problems with her right elbow after this procedure, so she underwent a second, more invasive, surgery. (*Id*.)  After that, she attempted to work a few hours a week, but her pain became much worse.  (Tr. 49.)

- She stopped working completely because she could not handle the physical requirements of her job.  (*Id*.)  If her right arm is not propped up for an extended period, it will ache and throb.  (*Id*.)  She elevates and heats her right arm each morning.  (Tr. 50.)

- She also has problems with her left elbow.  (Tr. 57.)  She does not remember exactly when her problems began.  (*Id*.)  She underwent occupational therapy for her left elbow, which did help.  (*Id*.)  While her right arm is worse, she still has aching and throbbing in her left elbow.  (Tr. 58.)  She does not have the "burning" and "crushing" sensation in her left elbow that she has in her right. (*Id*.)

- She can lift about a half gallon of milk with her right arm.  (Tr. 53.)  She can lift a 12-pack of soda with her left arm, but would not carry it any distance.  (Tr. 54.)  If she is sitting, she needs to have her right arm supported.  (*Id*.)  She occasionally feels unsteady or dizzy when walking or standing, due to medication side effects.  (*Id*.)

23

- She takes several medications, including Gabapentin, Wellbutrin, Elavil, Lidoderm, and Tramadol.  She takes Percocet once every few months.  (Tr. 45.) She has multiple side effects from her medications, including nausea, dizziness, lightheadedness, forgetfulness, and concentration and memory deficits.  (Tr. 46.) She thinks the Gabapentin causes most of these side effects.  (*Id*.)  Several times a week, she either will not take it at all or take it later in the day so she can drive. (Tr. 46-47.)

- She does not like to be around other people.  (Tr. 47.)  She isolates herself because she does not have "any purpose," as "working was such a big part" of her life.  (*Id*.)  She puts on a "happy face" for other people, because she once was outgoing and social.  (Tr. 52.)  Her husband is a coach, and her daughter is a student athlete, and she enjoys going to their basketball games and track meets. (Tr. 56.)  She will miss games due to pain and cramping, especially if the game is in the evening or if it is cold.  (*Id*.)

- She often has blurred and double vision, which makes her anxious.  (Tr. 48.) Her doctor has told her this is a side effect of the Gabapentin.  (*Id*.)

- She does light housekeeping and laundry.  (Tr. 50.)  She uses her left hand to dust.  (*Id*.)  She cleans in "spurts."  (*Id*.)  She cooks dinner a few times a week. (*Id*.)  She often needs a family member to go grocery shopping with her, because she cannot push a larger cart with both hands.  (Tr. 55.)  If she does any repetitive activity for too long, she will begin to have symptoms in her left arm. (Tr. 50.)  She avoids wearing clothing with buttons.  (Tr. 54.)  She has trouble picking up small objects with her right hand.  (Tr. 55.)

The VE did not testify as to Kinsley's past work, as the ALJ determined the skill level of her past employment "is too high at this point."  (Tr. 61.)  The ALJ then posed the following hypothetical question:

The individual can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, with a further restriction that pushing and pulling with the right dominant upper extremity would be limited to occasional only; this person could sit for six hours, stand and/or walk for six hours in a normal work day; this person cannot climb ladders, ropes or scaffolds; and can occasionally kneel and crawl; this person cannot reach overhead with the dominant right upper extremity; this person would be limited to occasional reaching in all other directions with the dominant right upper extremity; this person can frequently handle and finger with the dominant right upper extremity; this person is limited to simple, routine tasks that do not involve directing the work of others or being responsible for the safety or welfare of

24

others; this person cannot perform piece rate work or assembly line work.

(Tr. 61-62.)

The VE testified there would be jobs in the national economy for an individual with these limits, and stated he was "going to give [the ALJ] jobs that can be performed primarily with one extremity." (Tr. 62.) He indicated the Dictionary of Occupational Titles ("DOT") did not address this limitation, but he was basing his response on "research published in the Journal of Forensic Vocational Analysis in 2008," as well as his own experience with clients with extremity impairments. (*Id*.) The VE then testified this hypothetical individual would be able to perform representative jobs in the economy, such as mail clerk (light, unskilled), paint spray inspector (light, unskilled), and laboratory sample carrier (light, unskilled). (Tr. 63.)

The ALJ then posed a second hypothetical which was the same as the first, but with the additional limitation of "the dominant right upper extremity could only occasionally handle and finger." (*Id*.) The VE testified "it would not matter" and the individual could perform the same jobs provided for the first hypothetical. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he/she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Kinsley was insured on her alleged disability onset date, April 9, 2013, and remained insured through December 31, 2018, her date last insured ("DLI.")  (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Kinsley must establish a continuous twelve

month period of disability commencing between these dates.  Any discontinuity in the twelve

month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th

Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018 (Ex9D).

2.    The claimant has not engaged in substantial gainful activity since April 9, 2013, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: right carpal tunnel syndrome, right cubital tunnel, right epicondylitis, right ulnar neuropathy, major depression, anxiety state (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally push and pull with her right dominant upper extremity.  She cannot climb ladders, ropes or scaffolds and can occasionally kneel and crawl.  She cannot reach overhead with her right upper extremity.  She can occasionally, reaching[sic] in all other directions with her right upper extremity.  She can frequently handle and finger with her right upper extremity.  The claimant can perform simple, routine tasks that do not involve directing the work of others or being responsible for the safety or welfare of others.  She cannot perform piece rate work or assembly line work.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on June **, 1969 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 9, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-31.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

28

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    First Assignment of Error: Sentence Six Remand

In her first assignment of error, Kinsley argues this matter should be remanded for further administrative proceedings pursuant to Sentence Six of 42 USC §405(g) because she provided new and material evidence to the Appeals Council.[4]  (Doc. No. 10 at 16.)  She asserts these three opinions are all "new" because they were rendered after the ALJ decision.  (*Id*. at 16)  Kinsley argues these opinions are also "material," as they indicated significant restrictions and an inability to work, which could have changed the outcome of the ALJ decision.  (*Id*. at 17.)

Further, Kinsley maintains the "ALJ specifically asked at the hearing whether there was a medical source statement in the record from Dr. Seth, which suggests the ALJ wanted to know what his opinion was concerning [her] impairments."  (*Id*. at 16.)  As for the treatment notes from her orthopedist, Kinsley argues they were "clearly within the time period under adjudication," and therefore "are relevant to the adjudication period and cannot be considered not material on that basis."  (Doc. No. 13 at 2.)

Finally, Kinsley argues "good cause" as follows:

---

[4]     This evidence includes "an RFC assessment from [her] treating surgeon, a mental capacity assessment completed by [her] treating psychologist, and treatment notes and an opinion from [her] treating orthopedist."  (Doc. No. 10 at 16.)

30

> The ALJ made his decision eleven days after the hearing. T 40.  It is clear that Plaintiff's Counsel was not waiting for this evidence at the hearing, so it is likely she first became aware that a statement was necessary when the ALJ asked if one existed.  T 42.  Even if Plaintiff requested the opinions from her doctors right after her hearing, it is likely that she would not have been able to submit them in time.  There were statements in the record from all three treating sources stating that Plaintiff could not work.  T 473-75, 598, 606-609, 618.  It is not unreasonable to assume that Plaintiff relied on those statements to support her claim.

(Doc. No. 10 at 18.)

The Commissioner maintains remand is not warranted under Sentence Six because the evidence at issue is not material and Kinsley "cannot demonstrate good cause for failing to obtain and present this evidence to the ALJ prior to the issuance of the decision."  (Doc. No. 12 at 21.) She asserts because these records post-dates the June 2016 decision, they are "therefore not reflective of her condition during the relevant period."  (*Id*.)  The Commissioner further argues "even if these reports related back to her condition during the relevant period, they fail to support a reasonable probability that a different conclusion should be reached."  (*Id*. at 22.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g).  *Id.  See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. App'x 706, 717 (6th Cir. July 9, 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before
> the Commissioner of Social Security, but only upon a showing that there is
> new evidence which is material and that there is good cause for the failure
> to incorporate such evidence into the record in a prior proceeding; and the
> Commissioner of Social Security shall, after the case is remanded, and
> after hearing such additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact or the Commissioner's decision, or both,
> and shall file with the court any such additional and modified findings of
> fact and decision, and, in any case in which the Commissioner has not
> made a decision fully favorable to the individual, a transcript of the
> additional record and testimony upon which the Commissioner's action in
> modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*,---- F. Supp.3d ----, 2017 WL 588496 at * 2 (N.D. Ohio Feb. 14, 2017).  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

32

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster,* 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter,* 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter,* 2012 WL 1592750 at * 11. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

Kinsley argues a sentence six remand is appropriate based upon three treating source

opinions and several treatment notes from Dr. Hayek.[5]  On June 14, 2016, Kinsley visited Dr. Hayek for follow-up.  On examination, she had 1) tenderness over her right ulnar groove, 2) hypersensitivities at her right medial forearm and 4th and 5th digits, 3) weakness at her right hand intrinsic muscles, and 4) decreased grip strength on the right side.  (Tr. 851.)  Dr. Hayek renewed her Neurontin and Elavil prescriptions, and noted Kinsley was considering a change to her antidepressant medication.  (Tr. 850.)  Dr. Hayek also noted Kinsley took a "very rare" Percocet for her pain.  (*Id.*)

On July 19, 2016, Dr. Seth filled out a form prepared by Kinsley's counsel, entitled "Residual Functional Capacity Questionnaire."  (Tr. 855-857.)  He offered the following limitations/observations:

- Kinsley has carpal tunnel syndrome, cubital tunnel syndrome, medial epicondylitis, lateral epicondylitis, and a lesion of the radial nerve on the left;

- She cannot walk the length of a city block;

- She can continuously sit for more than 2 hours at a time, and stand for 2 hours at a time;

- On a good day, she can sit and stand/walk for about 4 hours total in an 8-hour working day;

- She will intermittently need to sit and lie in bed with her right arm on a pillow;

- She can lift and carry less than 10 pounds and cannot lift with her arm;

---

[5]     The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.  Moreover, the Court notes that much of the new medical evidence is duplicative and was already considered by the ALJ.  (Tr. 846, 848, 852, 853.) This evidence has been discussed *supra*.

- She can stoop and crouch for 80% of the workday;

- She is likely to have "good days" and "bad days;"

- She is likely to be absent from work more than four times a month;

- She does not require the use of an ambulatory device.

(*Id*.)

On July 20, 2016, Dr. Kessler filled out a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment."  (Tr. 858-876.)  Under the "Psychiatric Review Technique," Dr. Kessler considered Kinsley's condition under Listings 12.02, 12.04, 12.06, and 12.07.  (Tr. 858, 859.)  Under Listing 12.02, Dr. Kessler found Kinsley had a memory impairment due to medications, a change in personality, a disturbance in mood, and emotional lability.  (Tr. 859.)  She then provided the following discussion:

> Depression and anxiety due to loss of function in dominant hand and arm. [Insomnia] due to effects of medications as well as short-term memory loss. Loss of concentration, sense of purpose (due to loss of employment), loss of self-confidence and self worth.  Intermittent hopelessness due to chronic nature of the physical disability.

(*Id*.)  Under Listing 12.04, Dr. Kessler found Kinsley had 1) anhedonia or pervasive loss of interest in almost all activities, 2) appetite disturbance with change in weight, 3) sleep disturbance, 4) psychomotor retardation, 5) decreased energy, 6) feelings of worthlessness, and 7) difficulty concentrating or thinking.  (Tr. 861.)  Under Listing 12.06, Dr. Kessler determined Kinsley had 1) generalized persistent anxiety with motor tension and apprehensive expectation, and 2) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, as well as occasional panic attacks.  (Tr. 863.) Under Listing 12.07, Dr. Kessler found Kinsley had a persistent, organic disturbance of the use

35

of a limb.  (Tr. 864.)

Dr. Kessler then determined Kinsley had marked limitations in 1) activities of daily living, 2) maintaining social functioning, and 3) maintaining concentration, persistence, or pace. (Tr. 868.)  She noted there was "insufficient evidence" as to whether Kinsley had any episodes of decompensation.  (*Id.*)

Under the "Mental Residual Functional Capacity Assessment," Dr. Kessler determined Kinsley had markedly limited abilities in the following areas: 1) remembering locations and work-like procedures, 2) remembering and understanding very short and simple instructions, 3) understanding and remembering detailed instructions, 4) carrying out detailed instructions, 5) maintaining attention and concentration for extended periods, 6) sustaining an ordinary routine without special supervision, 7) working in coordination with or in proximity to others without being distracted by them, 8) making simple work-related decisions, 9) completing a normal work day and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, 10) responding appropriately to changes in a work setting, 11) traveling to unfamiliar places or using public transportation, and 12) setting realistic goals or making plans independently of others.  (Tr. 872-873.)

Dr. Kessler found Kinsley had moderately limited abilities in the following areas: 1) carrying out short and simple instructions, 2) interacting appropriately with the general public, 3) accepting instructions and responding appropriately to criticism from supervisors, and 4) getting along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (*Id.*) She found no significant limitation in the following areas: 1) performing activities within a

schedule, maintaining regular attendance, and being punctual within customary tolerance, 2)

asking simple questions or requesting assistance, 3) maintaining socially appropriate behavior

and adhering to basic standards of neatness and cleanliness, and 4) being aware of normal

hazards and taking appropriate precautions.  (*Id.*)

> At the end of the form, Dr. Kessler provided the following discussion:

> Krista Kinsley's disability has significantly changed her life.  Her career
> defined her and gave her purpose.  Losing her capacity to work has made
> her refocus on being available to her family.  Although most activities are
> difficult for her to accomplish, she tries to make her role as a wife and
> mother meaningful.  Side-effects of Neurontin and her pain medications
> have seriously effected her memory and concentration.  At times she cannot
> drive a car.  Krista has worked hard in therapy to maintain emotional
> stability.

(Tr. 875.)

> On August 24, 2016, Dr. Seth provided a letter regarding Kinsley. This letter provided:

> I saw Krista in the office for follow up recently.  This letter is to state her
> long term disability.

> Krista has long term pain down the right arm with paresthesias secondary
> to ongoing ulnar nerve symptoms.  She underwent 3 surgeries with failure
> of resolution of her symptoms.  She now has chronic pain.  She has pain
> with repetitive motion.  She also has pain with lifting and overhead
> activities.  This chronic pain has limited her ability to do activities of daily
> living.  She has been on medication.  Secondary to the side effects of
> medication this prevents her from working.

> I believe this will be long term and has limited her ability to function with
> activities of daily living.

(Tr. 878)

> On August 30, 2016, Dr. Hayek filled out a form created by Kinsley's private long-term

disability insurer entitled "Ongoing Physician's Statement of Disability."  (Tr. 844-845.)  He

listed her diagnoses as chronic right upper limb neuropathic pain and right ulnar neuropathy.  (Tr.

37

844.)  He opined Kinsley was "unable to return to work at this time."  (Tr. 845.)  He also checked a box indicating Kinsley had "severe limitations of functional capacity; incapable of minimal (sedentary) activity."  (*Id.*)

The Court finds Kinsley has not demonstrated a sentence six remand is warranted.  As an initial matter, Dr. Hayek's June 14, 2016 treatment note is not "new," as it predates the June 27, 2016 ALJ decision and the June 16, 2016 hearing.  (Tr. 15, 850, 851.)  Kinsley provides no explanation as to why this treatment note was not submitted at the time of the hearing.  In fact, during the hearing, Kinsley's counsel informed the ALJ there were "some recent office visits with Dr. Hayek," but they were "maintenance office visits" and the record did not need to be kept open.  (Tr. 42.)  Moreover, this treatment note is not "material" as it revealed essentially the same objective findings Dr. Hayek had made in his previous treatment notes.  (*See* Tr. 620, 645, 699, 851.)  As the Court finds this treatment note is neither "new" or "material," it does not warrant a sentence six remand.

Therefore, the Court's discussion will focus upon the treating source opinions from Drs. Seth, Hayek, and Kessler.  Each of these opinions are "new," as they all post-date both the administrative hearing and the ALJ decision.  *See Cross v. Comm'r of Soc. Sec.,* 373 F.Supp.2d 724, 734 (N.D. Ohio June 14, 2005).  However, Kinsley must also demonstrate the materiality of these opinions.  Kinsley's materiality argument centers on a "reasonable probability that the ALJ could have changed his decision," due to the opinions providing more specific details as to her limitations, and supporting a finding she could not work full-time or at a sedentary level.  (Doc. No. 10 at 17, Doc No. 13 at 3.)  The Court will address the materiality of each of these opinions in turn.

As noted *supra*, Kinsley's treating psychologist, Dr. Kessler, submitted a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment" on July 20, 2016. (Tr. 858-876.)  Dr. Kessler essentially found Kinsley met several mental Listings, including 12.04 and 12.06.  (Tr. 861, 863, 868.)  She also found a litany of "marked" limitations in several work-related areas.  (Tr. 872, 873.)  While this opinion, if adopted, would likely lead to a finding of "disabled," that is not the inquiry.  The inquiry is whether this opinion would have created a "reasonable probability that the ALJ would have rendered a different decision."  *Cross*, 373 F.Supp.2d, 734.  The Court finds it would not.  Dr. Kessler's opinions appear to be extreme in comparison with her own treatment notes, making it questionable the ALJ would have simply adopted her opinion.

For example, in her treatment notes, Dr. Kessler repeatedly notes Kinsley's concentration deficits and fixation over her career and right arm impairment.  (Tr. 483, 629, 624, 632, 650.)  However, she also notes "significant progress," as well as Kinsley attending sporting events, a family vacation, and a desire to volunteer and continue her education.  (Tr. 632, 629, 647.)  Moreover, Kinsley's treatment course consisted of twice monthly counseling and an anti-depressant.  At no point has Plaintiff required inpatient treatment or hospitalization.  She has not submitted any new evidence indicating psychiatric hospitalizations immediately preceding or following the ALJ decision, which would have indicated her mental health had deteriorated, and bolster Dr. Kessler's opinion.  Thus, the Court does not find Dr. Kessler's opinion was "material," as it likely would not have been adopted by the ALJ and resulted in a finding of disability.

Next, Kinsley's treating physician, Dr. Hayek, filled out a form for Kinsley's private

39

long-term disability insurer on August 30, 2016.  (Tr. 844-845.)  He opined she was "unable to work," and "incapable of minimal (sedentary) activity."  (Tr. 845.)  A review of the treatment notes indicates Dr. Hayek reached a similar conclusion on February 24, 2015, finding "I will fill out disability paperwork as she remains on long-term disability and is unable to return to work at this time due to her current loss of function at her right hand."  (Tr. 618.)  In the decision, the ALJ specifically acknowledged this opinion, afforded it little weight, and provided a detailed explanation as to why he was not adopting the conclusion she was "unable to return to work." (Tr. 24.)

While Dr. Hayek did find Kinsley was not able to perform sedentary work in the August 2016 opinion, it is unclear what this limit is based upon.  Kinsley does not have problems with her legs or back.  Her physical issues are limited to her right upper extremity.  Thus, it is unlikely the ALJ could have reached a different conclusion if he had received and considered Dr. Hayek's August 2016 opinion.  The ALJ had already rejected a similar opinion, and the additional limitation of less than sedentary work was not explained.  The Court does not find Dr. Hayek's opinion "material."

Finally, Dr. Seth, another treating physician, submitted two opinions following the ALJ decision.  He provided a July 2016 RFC assessment, which essentially limited Kinsley to less than sedentary work, including an inability to walk the length of a city block.  (Tr. 855-857.)  He also submitted a letter in August 2016, reporting pain and medication side effects "limited her ability to function" and "prevents her from working."  (Tr. 878.)  Similar to Dr. Kessler's opinion, this opinion, if adopted, would likely lead to a finding of "disabled."  However, Kinsley fails to establish why this opinion is material.  She argues this opinion is "far more detailed" than

previously submitted opinions.  (Doc. No. 10 at 16, 17.)  However, she does not explain why this opinion would have changed the outcome of the ALJ's decision.

Kinsley makes much of the fact the ALJ "specifically asked if a medical source statement from Dr. Seth existed," arguing the ALJ clearly "wanted to know what Dr. Seth's opinion was of [her] functional limitations."  (Doc. No. 13 at 2.)  However, a review of the hearing testimony indicates that at no point did the ALJ specifically request Kinsley submit an opinion from Dr. Seth.  The entirety of the exchange regarding Dr. Seth was as follows:

ALJ:   Counsel, do we have any Medical Source Statements from him?

Atty:   From Dr. Seth, no.

ALJ:   Okay.

Atty:   Just his office records.

ALJ:   All right.

(Tr. 49.)  From this brief exchange, Kinsley extrapolates the ALJ wanted Dr. Seth's opinion and such opinion would have "changed his decision."  (Doc. No. 13 at 2, 3.)  The Court finds no basis for this argument, and does not find Dr. Seth's opinion "material."

In sum, Kinsley appears to be assuming if the ALJ had the three treating source opinions discussed above, he would have adopted those physicians' findings and found her disabled.  This argument is not well-taken.  It is within the ALJ's discretion to determine the issue of disability, and the ALJ is not required to base his RFC findings on any one opinion.  *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x 719, 728 (6th Cir. 2013).  Thus, Kinsley has not established there is a "reasonable probability" the submission of these opinions would have changed the outcome.

However, assuming *arguendo* these opinions are "material," Kinsley still has not met

41

the burden of establishing "good cause."  In order to establish good cause, "a claimant must give a valid reason for [her] failure to obtain evidence prior to the date of the hearing."  *Cross*, 373 F.Supp.2d at 734.  In her brief, Kinsley notes the opinions are "dated only one month" after the decision, and she was not "aware that [an opinion from Dr. Seth] was necessary [until] the ALJ asked if one existed."  (Doc. No. 10 at 18.)  She argues because the "ALJ made his decision eleven days after the hearing," even if she had requested the opinions immediately following the hearing, "it is likely she would not have been able to submit them in time."  (*Id.*)

Kinsley fails to establish "good cause."  She does not explain why she did not obtain any treating source opinions *prior* to the hearing.  Morever, despite Kinsley's argument to the contrary, the ALJ did not request or require an opinion from Dr. Seth.  A review of the hearing testimony reveals Kinsley, at no point, advised the ALJ she was attempting to secure treating source opinions, or request the record be held open in order for these opinions to be considered.  *See Cross*, 373 F.Supp.2d at 734 (finding claimant did not show good cause for a sentence six remand because 1) he did not explain why he could not obtain his treating source opinion prior to the hearing, 2) at the hearing, his counsel did not advise the ALJ that he was trying to obtain the opinion, and 3) he did not request additional time to keep the record open).  Rather, Kinsley complains about the expediency in which the ALJ rendered the decision, arguing she did not have sufficient time to submit opinion evidence *after* the hearing, despite the fact she did not request the record to be held open.

In sum, the Court finds Kinsley has failed to carry her burden of demonstrating a sentence six remand is warranted.  Accordingly, and for all the reasons set forth above, Kinsley's first assignment of error is without merit.

42

**B.**      **Second Assignment of Error: Step Two Finding**

In her second assignment of error, Kinsley argues the ALJ erred in failing to recognize her left hand impairment as "severe" at step two of the sequential evaluation.  (Doc. No. 10 at 18.)  She asserts the ALJ "failed to consider any of the evidence that proved [she] still had pain in her left arm after treatment, and her pain did last twelve months."  (*Id*. at 19.)  Kinsley acknowledges treatment records for her left arm spanned from June 16, 2015 to March 8, 2015, which is less than twelve months.  (*Id*.)  However, she maintains her "pain log" and testimony provided evidence of left arm symptoms through the date of the hearing.  (*Id*.)  Kinsley maintains the "ALJ's failure to find her left arm impairment severe was not harmless, as the VE testified that if [she] was limited to less than frequent use of the left arm, she would not be employable." (*Id*. at 19, 20.)

The Commissioner contends the ALJ properly determined Kinsley's left arm impairment did not constitute a severe impairment.  (Doc. No. 12 at 11.)  She asserts the "ALJ carefully reviewed the medical and other evidence of record and properly concluded that Plaintiff's left arm impairments were not severe because to[sic] the pain did not last for 12 months in duration."  (*Id*. at 12.)  She maintains because the "ALJ finds at least one severe impairment and proceeds though the sequential analysis beyond Step Two, her failure to find that particular alleged impairments, standing alone, are severe, is hardly reversible error."  (*Id*.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20

43

C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

44

When the ALJ considers all of a claimant's impairments in the remaining steps of the

disability determination, the failure to find additional severe impairments at step two does "not

constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th

Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  The

Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds

that a claimant has established at least one severe impairment) and claimant's severe and

non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he

fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally

irrelevant."  *Anthony v. Astrue*, 2008 WL 508008 at * 5.

Here, at step two, the ALJ concluded Kinsley's right carpal tunnel syndrome, right

cubital tunnel, right epicondylitis, right ulnar neuropathy, major depression, and anxiety state

constituted "severe" impairments.  (Tr. 17.)  He then found her left elbow pain was not "severe,"

explaining as follows:

> The claimant indicated in June 2015 she had pain in her left elbow.  The
> claimant had an x-ray of her left elbow which was normal.  The claimant
> was administered an injection, which improved her pain (Ex17F: 21F/37).
> In November 2015, the claimant was only having intermittent pain in her
> left elbow.  She was diagnosed with a lesion of the radial nerve of the left
> upper limb (Ex21F/42).  The claimant was prescribed a small amount of
> Tramadol for the pain (Ex21F/42).  In December 2015, the claimant
> indicated that her left arm pain had improved.  She was wearing an over
> the counter wrist splint when performing tasks (Ex21F/36).  Thereafter,
> she was getting good relief from exercise and ice (Ex21F/34).  The
> claimant was able to perform daily tasks (Ex21F/25).  In 2016, the
> claimant had good range of motion in the left elbow (Ex21F/11-22).  In
> February 2016, the claimant had no significant pain in her left upper
> extremity.  She did not continue with physical therapy, since she had made
> good progress with treatment (Ex21F/2-5).
>
> Subsequently, in 2016, the claimant indicated that after having
> acupuncture, she had no pain in her left hand (Ex26F).  In contrast to her

45

testimony, the objective evidence showed that the claimant's pain in her left elbow did not last for twelve months in duration.  Therefore, the evidence does not result in any physical limitations and is not considered a severe impairment.

(Tr. 17, 18.)

The Court finds substantial evidence supports the ALJ's conclusion Kinsley's left arm impairment is non-severe.  The record reflects Kinsley initially reported pain in her left elbow to Dr. Seth on June 16, 2015.  (Tr. 638.)  On examination, she had moderate tenderness in the elbow, and pain with elbow extension.  (Tr. 639.)  Her muscle strength was decreased to a 4/5, but her light touch sensation was normal.  (*Id.*)  Dr. Seth ordered left elbow x-rays, which revealed no abnormalities.  (*Id.*)  He then administered a Depomedrol injection into her left elbow.  (*Id.*)

Kinsley returned to Dr. Seth on November 24, 2015, indicating her left elbow pain was intermittent and "worse with overuse."  (Tr. 694.)  She indicated she had pain with lifting.  (*Id.*)  Dr. Seth recommended physical therapy to "calm down the inflammation that she is having around the nerve."  (Tr. 696.)  Kinsley subsequently attended physical therapy, and by January 5, 2016, she indicated her "left elbow was improving," but she "still has aggravated pain with lifting of the left arm."  (Tr. 675.)  Dr. Seth noted an increased range of motion in the left elbow. (*Id.*)

Kinsley received acupuncture from Dr. Mok on January 26, 2016.  (Tr. 715.)  He noted Kinsley "has left arm symptoms recently," and diagnosed her with a flexor radial muscle strain on the left side.  (Tr. 715.)  She returned to Dr. Mok on February 23, 2016, and reported "her left hand improved rapidly after the last visit and now has no further symptoms in this hand."  (Tr. 721.)  Kinsley visited Dr. Seth on March 8, 2016, and again reported her left arm was doing

46

"much better."  (Tr. 655.)  On examination, she had trace tenderness at the left elbow, no swelling, no crepitus, and mild pain with extension.  (Tr. 656.)  Her left elbow strength was still decreased at 4/5.  (*Id.*)

There is no further *objective* medical evidence of Kinsley's left elbow symptoms following this office visit.  (Doc. No. 10 at 19.)  Thus, the objective medical evidence and treatment for Kinsley's left elbow spans 10 months, from June 2015 to March 2016.

However, Kinsley argues there is evidence her left elbow symptoms "lasted beyond the medical evidence of record," citing her symptom log[6] and hearing testimony.  (Doc. No. 10 at 19.)  A review of Kinsley's symptom log does indicate her left elbow continued to bother her.  On April 8, 2016, her left arm was "aching and throbbing" after cleaning her kitchen.  (Tr. 828.)  However, the next day, she was able to use her left hand to "prime cabinets using a foam roller and foam brush."  (*Id.*)  She again indicated left elbow pain on April 11 and 12, 2016, but she was able to paint cabinets for 45 minutes using her left hand on April 13 and 18, 2016.  (Tr. 829, 830.)  Kinsley continued to report left elbow and forearm pain for the remainder of April 2016 and intermittently in May 2016.  (Tr. 831, 832.)

At the hearing, Kinsley testified regarding her left arm, explaining as follows:

Like, I'll dust for a little bit and this is typically with my left hand, I don't use my right hand to do it.  You know, I might dust and then I'll take a break for awhile and then I'll go back and wash a window or whatever.  I don't do it all at once, because if I do repetitive things in a row, I'll start having symptoms more frequent or faster with my left arm.  Then it's problematic, because both arms are having issues and that's sort of hard to function and do things.

---

[6]     As noted *supra,* Kinsley submitted a "symptom log" to the ALJ.  This log, created through a program on her smart phone, documents her reported pain and daily activities from April 1, 2014 through June 11, 2016.  (Tr. 722-839.)

(Tr. 50.)  The ALJ then further questioned her, asking how much she could lift with her left hand.

Kinsley responded:

> I can pick up a bottle, like a 12-pack of pop, like from a shelf and put it in the cart kind of thing.  I wouldn't carry that probably any distance.  I'm not sure how much that weighs.

(Tr. 54.)  Her attorney questioned her regarding her left arm, and Kinsley responded the pain was

just in her left "elbow, forearm, occasionally into that thumb area along this side.  Just aching

and throbbing though, I don't have the burning, crushing, stabbing."  (Tr. 59.)

   It is clear the ALJ considered this *subjective* evidence when reaching his conclusion.  In

the decision, the ALJ acknowledged Kinsley's left elbow testimony, but cited to the objective

medical evidence, noting it revealed Kinsley's "pain in her left elbow did not last for twelve

months in duration."  (Tr. 18.)  The ALJ also referenced Kinsley's symptom log, throughout the

decision, indicating he had reviewed it.  (Tr. 19, 21, 23.)  When the objective medical evidence

does not conform with the claimant's subjective reports, the ALJ "has the power and discretion to

weigh all of the evidence and to resolve the significant conflicts in the administrative record."

*Workman v. Comm'r of Soc. Sec.,* 105 Fed. App'x 794, 801 (6th Cir. 2004) (citing *Walters v.

Comm'r of Soc. Sec.,* 127 F.3d 525, 531(6th Cir. 1997).  The ALJ's conclusion the medical

evidence, despite Kinsley's subjective complaints, indicated her left elbow impairment was non-

severe, is supported by substantial evidence.

   The Court further finds that even if the ALJ erred in finding Kinsley's left elbow

impairment was non-severe at step two, the ALJ's consideration of the cumulative effect of

Kinsley's impairments (both severe and non-severe) throughout the remaining steps of the

analysis rendered any such error harmless.  The Sixth Circuit, in *Maziarz v. Sec'y of Health &*

48

*Human Servs.*, held that an ALJ's failure to find a condition to be a "severe" impairment, "does not constitute reversible error if [the ALJ] determined that Plaintiff had at least one other impairment at Step Two and continue to evaluate Plaintiff's severe and non-severe impairments under the remaining steps of the evaluation process." *Lagore v. Colvin,* 2014 WL 1383339 *11 (N.D. Ohio April 8, 2014) (citing *Maziarz,* 837 F.2d at 244).

Courts within this district have repeatedly applied *Maziarz* when repudiating claims an ALJ erred when failing to categorize a claimant's additional impairments as "severe" at step two. *See Sniarowski v. Colvin,* 2016 WL 1084757, *7-8 (N.D. Ohio Jan. 25, 2016), *Gonzales v. Comm'r of Soc. Sec.,* 2014 WL 2126572, *17 (N.D. Ohio May 21, 2014), *Lagore,* 2014 WL 1383339 at *11, *Walton v. Astrue,* 773 F.Supp.2d 742, 747 (N.D. Ohio Jan. 18, 2011).

Kinsley argues the ALJ "did not include any functional limitations in the RFC to account for" her left arm complaints. (Doc. No. 13 at 4.) The Court disagrees. The ALJ's decision reflects he considered Kinsley's left elbow in his RFC analysis, as he noted her ability to "perform a significant level of activities, using both hands." (Tr. 25.) He also limited Kinsley to the light exertional level, which includes lifting and carrying limits for *both* upper extremities, not just the right. (Tr. 20.) While he did not provide for any manipulative or reaching limitations with the left upper extremity, given the minimal evidence of a left hand impairment, this is reasonable. It is clear he considered all of Kinsley's impairments, both severe and non-severe, throughout the sequential analysis. Therefore, even assuming *arguendo* Kinsley's left elbow impairment should have been categorized as "severe," under *Maziarz,* this does not constitute reversible error.

Accordingly, and for all the reasons set forth above, Kinsley's second assignment of

error is without merit.

**C.      Third Assignment of Error: Credibility Evaluation**

In her third assignment of error, Kinsley argues the ALJ cited selectively from the record and her symptom log, and "ignores evidence that supports [her] allegations."  (Doc. No. 10 at 21.)  She maintains the ALJ had "rejected [her] allegations only on the basis of daily activities," and his analysis of those daily activities was flawed.  (*Id*.)  She argues the ALJ would reference an activity she was able to perform or participate in but then "ignore qualifying information," which indicated these activities increased her pain level.  (*Id*. at 22, 23.)  Kinsley asserts the ALJ decision is "replete with examples of his failure to consider qualifying statements that are contrary to his finding."  (Doc. No. 13 at 5.)  She maintains there were several entries in her "pain log" he "did not consider at all," which indicated high levels of pain and increasing difficulty performing daily tasks.  (Doc. No. 10 at 23.)  Kinsley argues the ALJ "impermissibly ignored this evidence without any explanation."  (*Id*. at 24.)

The Commissioner argues the ALJ properly assessed Kinsley's subjective complaints. (Doc. No. 12 at 18.)  She asserts the "ALJ extensively considered the objective medical evidence, medical opinions, treatment history, and evidence of daily activities."  (*Id*. at 18, 19.)  She maintains the ALJ did not primarily rely on Kinsley's daily activities when assessing her RFC. (*Id*. at 19.)  The Commissioner contends it was reasonable for the ALJ to conclude "these activities reflected her ability to perform at greater levels than she represented."  (*Id.* at 20.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).

However, when a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[7] 2016 WL 1119029 (March 16, 2016).  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 834 (6th Cir. June 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[8] determination of the individual's statements based on the entire case record.

---

[7]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the June 16, 2016 hearing.

[8]     SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029 at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

　　　　To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 16-3p, Purpose, 2016 WL 1119029  (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[9]  The ALJ need not analyze all

---

　　　　subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).  Regardless, neither party has argued the analysis is different under SSR16-3p.

[9]　　　The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and

seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F.

Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Kinsley's testimony she has difficulty using her right

upper extremity, and she "was limited to only using her left upper extremity."  (Tr. 21.)  The ALJ

determined Kinsley's medically determinable impairments could reasonably be expected to cause

the alleged symptoms, however, the ALJ found her statements concerning the intensity,

persistence, and limiting effects of these symptoms were "not entirely consistent with the medical

evidence and other evidence in the record."  (*Id*.)  The ALJ then provided a 9-page discussion of

Kinsley's daily activities, treatment records, the objective findings on examination, the

diagnostic testing, and the opinion evidence.  (Tr. 21-29.)

Kinsley's main point of contention is not with the ALJ's discussion of her treatment

notes or the objective findings upon examination, but rather the manner in which the ALJ

discussed her symptom log entries.  (Doc. No. 10 at 21 - 23.)  The ALJ did consider Kinsley's

symptom log, and referenced it numerous times in the decision, dedicating multiple paragraphs to

the discussion of Kinsley's reported daily activities.  (Tr. 21-27.)  For example, the ALJ provided

the following discussion:

> The evidence showed that the claimant was performing activities with the
> use of her right upper extremity.  On January 14, 2014, the claimant did the
> laundry.  She wrote out checks for taxes, copied and mailed them.  She
> went to the post office, the bank and city hall.  She then went to the grocery
> store.  She unloaded and put the groceries away (Ex27F/42).  On January

---

restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at
* 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D.
Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her
credibility findings in terms of the factors set forth in the regulations, thereby
permitting the court to "trace the path of the ALJ's reasoning.")

29, 2015, the claimant indicated that she had cut vegetables and made pepperoni rolls for the "team dinner" (Ex27F/45).  On March 4, 2015, the claimant indicated that she was able to "fill out many forms for her attorney."  That same day, she had gone shopping with her daughter.  She helped her daughter try on dresses.  The claimant indicated she was doing zippers, hooks and ties on the dresses, to assist her daughter (Ex 27F/53).  On May 6, 2015, she worked in her home office for twenty minutes to sort and organize papers (Ex27F/65).  That same month, in May 2015, the claimant helped her husband with the deck (Ex27F/65).  Although, she said she isolated herself from others due to pain, the evidence does not support this assertion.

Subsequently, the claimant attended her daughter's award ceremony.  She was sitting with others at the same table (Ex27F/66).  On June 1, 2015, the claimant painted the front door.  She used her right hand to trim around the small window and to hold a small plastic tray with small roller (Ex27F/69).  That same month, the claimant helped her husband clean out the laundry room and workroom.  The claimant was able to help with the small things and going through the boxes (Ex27F/70).  The following month, the claimant went to one of her children's games and sat in the ballpark (Ex27F/76).  She also went to the resale store and shopped for over an hour (Ex27F/75).

(Tr. 24-25)

Kinsley argues the ALJ mischaracterized these reported activities by not mentioning the "qualifying information" following the report of each activity, namely, that these activities resulted in increased pain.  (Doc. No. 10 at 23.)  Upon review of Kinsley's symptom log, the Court agrees.  The ALJ searched the symptom log for daily activities to support his conclusions, while at the same time, failing to acknowledge these very daily activities were causing her increased pain.  For example, the ALJ noted on March 4, 2015, Kinsley went prom dress shopping with her daughter, and was using "zippers, hooks, and ties."  (Tr. 24, 774.)  However, the ALJ failed to mention she was only able to do so for "less than 30 minutes," and later that day, she was in excruciating pain.  (Tr. 774.)  The ALJ then noted Kinsley was able to organize and sort papers on May 6, 2015.  (Tr. 24.)  Similarly, the ALJ declined to further note this

54

activity resulted in "cramping and throbbing" and "crushing pain."  (Tr. 786.)

While the Court agrees the ALJ could have been more forthcoming when discussing Kinsley's daily activities, it was not improper for the ALJ to support a portion of his credibility assessment on Kinsley's continued ability to perform a wide range of daily activities.  Even though her right upper extremity pain may have been exacerbated by the various tasks cited by the ALJ, the fact remains she continued to perform these sorts of activities on a regular basis. This supports the ALJ's conclusion Kinsley's pain and mental health allegations were not as severe as alleged.  *See Anderson v. Berryhill,* 2017 WL 1326437, *14 (N.D. Ohio Mar. 2, 2017) (finding the ALJ did not err in conducting a credibility analysis when she noted a claimant's ability to drive a stick shift, but did not mention driving a stick shift aggravated the claimant's pain).

Further, contrary to Kinsley's argument, the ALJ did not discount her allegations "only on the basis of her daily activities."  (Doc. No. 10 at 21.)  Indeed, the ALJ's discussion of Kinsley's daily activities was only one factor in his credibility determination.  The decision also considered Kinsley's treatment, the objective findings upon examination, the diagnostic testing, and the effectiveness of her medications.  For example, the ALJ provided a detailed and thoughtful review of Kinsley's physical therapy records, nothing she was "making gradual gains with her right upper extremity range of motion" and was "able to use a light cuff weight to improve her elbow flexion and extension."  (Tr. 22.)  He also reviewed the objective findings of Kinsley's orthopedist, noting she was "without any gait abnormalities" and "had 5/5 muscle strength throughout with the exception of 'some very mild weakness of her right abductor digit minimi muscle.'"  (*Id.*)  The ALJ discussed each of Kinsley's operations, and noted after her

August 2014 surgery, she had "good range of motion in her elbow," with a "mild amount of swelling."  (Tr. 23.)  The ALJ then provided a discussion of the effectiveness of acupuncture sessions and her medications, acknowledging some reported side effects.  (Tr. 25.)

In addition, the ALJ also openly acknowledged the objective findings indicating Kinsley had some degree of limitation in her right arm.  He noted Kinsley continued to have decreased strength in the right arm, along with some sensitivity over the ulnar nerve, even after her surgeries.  (Tr. 23.)  The ALJ noted she still had "difficulty with some fine motor tasks," including "difficulty turning the lid on a water bottle, turning doorknobs or pushing down on a door handle," but also continued to make "good gains with right grip and pinch strength."  (*Id.*)  Then, in formulating Kinsley's RFC, the ALJ accommodated her various limitations, by restricting her to light work, and rather significant  restrictions for her right upper extremity.

Thus, while the ALJ's characterization of the daily activities, namely, ignoring her reports of pain with these activities, may be troubling, it does not warrant reversal.  The Sixth Circuit has held "even if an ALJ's adverse credibility determination is based partially on invalid reasons . . . the ALJ's decision will be upheld as long as substantial evidence remains to support it."  *Johnson v. Comm'r of Soc. Sec.,* 535 Fed. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012).  Substantial evidence supports the ALJ's credibility determination.  As the ALJ correctly noted, Kinsley did make gradual gains in strength and function, particularly in her fingers, with surgery and therapy.  (Tr.  561, 549, 522, 525.)  She eventually had no more numbness and tingling in her fingers, and her pain was centralized in her right elbow.  (Tr. 581, 582.)  She did continue to have pain, numbness, and limitation in her right upper extremity, particularly with any extended use of her right arm.  (Tr.

56

525, 526, 528.)  Kinsley also consistently reported side effects from her medications.  (Tr. 451, 360.)  However, the ALJ acknowledged this in his decision, and subsequently provided for limitations in her right upper extremity, along with some concentration limitations as well.

In sum, the ALJ considered a number of factors in assessing Kinsley's credibility, including her treatment course, the objective findings upon examination, and her daily activities. These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear.

Accordingly, the Court finds substantial evidence supports the ALJ's credibility assessment.  Kinsley's third assignment of error is without merit.

**D.      Fourth Assignment of Error: Opinion Evidence**

In her final assignment of error, Kinsley argues the ALJ improperly evaluated the opinions of her treating physicians, Drs. Seth, Hayek, and Kessler.  (Doc. No. 10 at 24.)  She maintains the "rejection of all three opinions is harmful, because they suggest [she] is incapable of performing any work."  (*Id*. at 26.)  She asserts the "reasons provided by the ALJ do not find support in the record" and are not "good reasons for rejecting the opinions" of treating physicians.  (*Id*.)  Kinsley argues the ALJ's rejection of these opinions was based upon a "flawed credibility finding," citing the ALJ's selective use of her symptom log.  (*Id*. at 24, 26.)

The Commissioner argues the ALJ properly weighed the treating source medical opinions.  (Doc. No. 12 at 13.)  She maintains the "ALJ thoughtfully and extensively addressed the medical evidence and opinions in determining the limitations for the RFC finding, and she explained the weight she assigned to these opinions."  (*Id*.)  She asserts substantial evidence supports the ALJ's conclusions.  (*Id*.)

57

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that

58

she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

### Drs. Seth and Hayek

The ALJ weighed the opinion evidence from Drs. Seth and Hayek as follows:

By October 2014, the claimant's right upper extremity strength was getting better overall.  She had some numbness in the small and ring finger.  She was prescribed Neurontin for the nerve pain.  The claimant said that the Lidoderm path was helpful, and she was advised to continue using the medication.  She was also, advised to use an elbow sleeve.  She was advised to continue attending occupational therapy to improve her

59

functioning.  **The physician[10] opined that the claimant should remain off work since she was not ready to return to work due to decreased strength, pain and numbness in two of her fingers (Ex13F/2).  I give little weight to the opinion from the treating physician since it was not consistent with the evidence of the claimant's extensive daily activities or supported by the objective evidence showing only mildly abnormal exams.**

\* \* \*

At her appointment on January 2015, the physician noted that the claimant's main limiting factor in the use of her right upper extremity was due to neuropathic pain.  The dose of Neurontin was increased. She was taking a limited amount of Percocet at nighttime (Ex15F/6).  The following month, the claimant indicated that she was having some difficulty tolerating the increased dose of Neurontin.  On examination, she had decreased sensation at her right medial forearm, fourth and fifth digits on the right, to light touch.  She had mild intrinsic wasting with decreased grip strength on the right.  The proximal right upper limb strength was 5/5 throughout.  The claimant was prescribed Cymbalta for pain, and a limited amount of Percocet (Ex15F).  **The physician[11] opined that the claimant was unable to return to work due to the loss of function in her right hand.  (Ex15F/4).**

**I give little weight to the opinion from the treating physician since it was not consistent with the evidence.  The evidence showed that the claimant was performing activities with her right upper extremity.**  On January 14, 2014, the claimant did the laundry.  She wrote out checks for taxes, copied and mailed them.  She went to the post office, the bank and city hall.  She then went to the grocery store.  She unloaded and put the groceries away (Ex27F/42).  On January 29, 2015, the claimant indicated that she had cut vegetables and made pepperoni rolls for the "team dinner" (Ex27F/45).  On March 4, 2015, the claimant indicated that she was able to "fill out many forms for her attorney."  That same day, she had gone shopping with her daughter.  She helped her daughter try on dresses.  The claimant indicated she was doing zippers, hooks and ties on the dresses, to assist her daughter (Ex 27F/53).  On May 6, 2015, she worked in her home

---

[10]    The Court notes this unnamed physician was Dr. Seth, Kinsley's treating orthopedist.  (Tr. 598.)

[11]    The Court notes this unnamed physician was Dr. Hayek, Kinsley's treating physician.  (Tr. 618.)

office for twenty minutes to sort and organize papers (Ex27F/65).  That
same month, in May 2015, the claimant helped her husband with the deck
(Ex27F/65).  Although, she said she isolated herself from others due to
pain, the evidence did not support this assertion.

(Tr. 23-24) (emphasis added).

The Court finds the ALJ did not err when assigning little weight to the conclusions of

Drs. Seth and Hayek.  Both Dr. Seth's and Dr. Hayek's statements were conclusions Kinsley was

"unable to work," and offered no specific functional limitations.  (Tr. 598, 618.)  Thus, these

conclusions are not opinions of a medical condition.  *See Morr v. Colvin,* 2015 WL 350384 at *5

(N.D. Ohio Jan. 26, 2015).  Rather, they were opinions on an issue reserved for the

Commissioner, and entitled to no special significance or deference. *See Turner,* 381 Fed. App'x

at 493 and *Curler,* 561 Fed. App'x at 471.  The ALJ's decision need only "explain the

consideration given to the treating source's opinion."  *Johnson v. Comm'r of Soc. Sec.,* 535 Fed.

App'x at 505.

Here, the ALJ assigned the conclusions Kinsley was unable to work "little weight."  (Tr.

23 -24.)  He then explained his conclusion, citing lack of consistency with the objective evidence

and Kinsley's activities.  (*Id.*)  As the "good reasons" requirement does not apply here, this is all

which was required of the ALJ.  The ALJ was not required to defer to the doctors' statements

regarding disability. *Morr,* 2015 WL 350384 at *5.

The ALJ's rejection of Drs. Seth's and Hayek's disability opinion was also supported by

substantial evidence.  As the ALJ correctly noted, during Kinsley's October 21, 2014 office visit

with Dr. Seth, her strength had improved, but she continued to have pain and burning.  (Tr. 598.)

61

During her January 27, 2015 office visit[12] with Dr. Hayek, she had 5/5 muscle strength in her right upper extremity, with the "exception of weakness at her right abductor digiti minimi." (Tr. 620.)  She had decreased sensation over two of her fingers and right forearm. (*Id*.)  In February 2015, her right upper limb strength continued to be 5/5, though she had decreased grip strength and "hand intrinsic" weakness on her right. (Tr. 618.)  As for the ALJ's analysis of Kinsley's daily activities, this has already been discussed at length above.  While the ALJ was less than forthright with his evaluation of her pain log, the fact remains her pain log did demonstrate she could perform some degree of activity on a daily basis, which supports his conclusion to afford "little weight" to the conclusions she could not work.

In sum, the ALJ was not required to provide "good reasons" or afford any special deference to the conclusions Kinsley was unable to work.  Further, substantial evidence supports the ALJ's decision to afford "little weight" to the conclusions offered by Drs. Seth and Hayek.

### Dr. Kessler

As noted *supra,* Dr. Kessler, Kinsley's treating psychologist, filled out two separate SSA-prepared forms regarding Kinsley. (Tr. 473-475, 606-609.)  After summarizing Dr. Kessler's observations and opinion from the first form, dated August 6, 2014, the ALJ weighed her opinion as follows:

> **I give little weight to the opinion from Dr. Kessler since it was not consistent with the evidence.  Dr. Kessler was not able to assess the claimant's physical functioning of her right upper extremity.**

---

[12]     The Court notes Dr. Hayek had only seen three times Kinsley when he rendered his opinion. (Tr. 617, 619.)  The Court questions whether Dr. Hayek was actually a "treating source" at the time of his opinion.  Since neither party has raised this issue, the Court will not address it further.

62

**Furthermore, as previously described herein, the claimant was not as limited in her social functioning or concentration as described by Dr. Kessler (Ex27F).**  The claimant had advised her counselor that she was performing activities that were inconsistent with these limitations.  The claimant attended two counseling sessions in August 2014. The claimant was learning techniques to adapt to the limited use of her arm.  At one session, the claimant was planning a social activity with others (Ex9F). Thereafter, the claimant had surgery on her right ulnar nerve, which improved her pain (Ex10F). The claimant was not referred to a psychiatrist for treatment of her depression or anxiety. Then in October 2014, the claimant requested medication from her primary care physician for depression. At that time, the claimant was prescribed Cymbalta, which was improving her pain and depression (Ex12F).

(Tr. 28) (emphasis added.)  Then, the ALJ summarized Dr. Kessler's October 29, 2014 form.

(*Id*.)  He weighed her opinion as follows:

**I give little weight to the opinion from Dr. Kessler since these limitations were not consistent with the probative evidence.**  As previously described in detail, the claimant was performing a significant amount of activities, which involved the use of her right upper extremity. She was driving her children and attending their sporting events.  The claimant was performing home improvement projects.  In addition, she was attending several social events and going on vacations (Ex27F: 16F: 17F).

In 2015, the claimant attended counseling to improve her depressed mood about the loss of her job.  The claimant continued to attend sporting events for her daughters.  In March 2015, the claimant was doing things around the house.  She was planning a family vacation (Ex16F/7).  At the following session, in April 2015, the claimant indicated that she had enjoyed the family vacation (Ex16F/6).  In June 2015, the claimant indicated that she was benefitting from the pain support group that she was attending (Ex16F/2).  In August 2015, the claimant was helping her brother with a legal matter.  The claimant was able to manage bill-paying responsibilities for the household, despite the side effects of the medication (Ex17F).

Thereafter, the claimant was attending counseling and she was being encouraged by Dr. Kessler to develop new interests.  She was excited about working on decorating her home.  She said she was interested in having a social outing with other coaches' wives (Ex20F/4).  In February 2016, the claimant was exercising at the YMCA, which indicated that she was not having significant pain in her right arm.  In addition, she was attending her daughter's games (Ex20F/3).  Thereafter, the claimant said she was

interested in volunteering, but was worried she would lose her long-term disability benefits (Ex20F/2).  The claimant was also interested in taking some adult education classes (Ex20F/2).  **The claimant's ability to perform these activities was inconsistent with the opinion that the claimant was unable to work.**

Furthermore, in February 2016, the claimant's treating physician noted that the claimant's mood was good.  She had no pain.  At that time, she was taking Wellbutrin, which was improving her mood (Ex22F).  In April 2016, the claimant had a mental status evaluation performed by Dr. Kessler.  The evaluation showed the claimant presented with good hygiene.  She had normal posture and gait.  She could become distracted and confused due to the Neurontin.  She was cooperative in her demeanor and had good eye contact.  Her affect was appropriate, but she could isolate when she was depressed.  She struggled with the reality of her physical limitations.  The claimant was frustrated due to loss of work.  The claimant relied on lists for action and struggled with executive functioning, which was frustrating to the claimant (Ex23F).

**I give little weight to the opinion from Dr. Kessler that the claimant was significantly limited in her social functioning, concentration, persistence and pace or with the ability to perform executive functioning due to depression, pain and medication side effects**.  **Overall, the probative evidence contradicted this opinion**.  The claimant testified and admitted that when her husband was out of town, she was responsible for performing all of the parenting responsibilities. She was driving her children to their scheduled activities.  The claimant was managing the household finances.  In addition, she was assisting her brother with a legal matter (Ex 17F).  The claimant was completing home improvement projects (Ex20F).  In addition, she was attending social events, for her children and friends (Ex27F).  The claimant's ability to perform these types of activities indicated that her social functioning and concentration, persistence and pace, were not as limited as asserted (Ex23F: 16E).

(Tr. 28-29)(emphasis added.)

The Court finds the ALJ did not err in assigning less than controlling weight to Dr. Kessler's opinions.  As an initial matter, the Court notes Kinsley conceded Dr. Kessler, as a psychologist, did "not have the expertise to assess [her] physical functioning."  (Doc. No. 10 at 26.)  Therefore, the Court's discussion will focus on Dr. Kessler's opinions regarding Kinsley's

64

mental limitations.

In assigning "little weight" to Dr. Kessler's opinions, the ALJ addressed the consistency and supportability of the opinions, noting they conflicted with the selected treatment course, Dr. Kessler's own treatment notes, and Kinsley's reported daily activities.  (Tr. 28-29.)  Rather than just simply listing these reasons, the ALJ then painstakingly cited directly to the record, noting specifically where Dr. Kessler's opinion was inconsistent with the evidence.  In fact, the ALJ's evaluation of Dr. Kessler's opinions covers over two pages, and contains exact references to Dr. Kessler's treatment notes and Kinsley's reported daily activities.  (*Id*.)  It is clear the ALJ thoroughly evaluated the evidence, and then applied this evidence to Dr. Kessler's opinions when assigning them "little weight."  Thus, the ALJ sufficiently provided "good reasons" for giving her opinions less than controlling weight.

Kinsley argues there "is a multitude of evidence that supports" Dr. Kessler's opinion she was "struggling with memory and concentration while on medications."  (Doc. No. 10 at 26.) While Kinsley cites evidence from the record which indicates she was struggling with medication side effects, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  In this case, the ALJ clearly articulated why he found Kinsley's concentration and medication side effects were not as limiting as opined by Dr. Kessler, referencing the various activities she performed to manage her household.  (Tr. 29.)  Moreover, the ALJ limited Kinsley to "simple, routine tasks," which Dr. Kessler specifically determined Kinsley could perform.  (Tr. 20, 607.)

Further, substantial evidence supports the ALJ's finding Dr. Kessler's opinions were

entitled to little weight.  While Dr. Kessler repeatedly notes Kinsley's concentration deficits and

depression over her career and physical limitations, she also noted "significant progress," as well

as Kinsley attending sporting events, a family vacation, and a desire to volunteer and continue

her education.  (Tr. 483, 624, 629, 632, 647, 650.)  Kinsley also reported her antidepressant was

effective.  (Tr. 710.)  It is true Kinsley repeatedly indicated poor concentration and a "mental

fog" due to her pain medications.  (Tr. 396, 451, 549, 635, 704.)  However, as the ALJ correctly

noted, Kinsley was still able to plan a vacation, organize social outings, shop, drive short

distances, and attend sporting events.  (Tr. 609, 630, 635).

Accordingly, the Court finds the ALJ met his burden of offering good reasons to support

his decision to assign less than controlling weight to Dr. Kessler's opinions.  Kinsley's final

assignment of error, therefore, is without merit and does not provide a basis for remand.

### VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 24, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**